IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

TERRY LEE JONES,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )     Case No.
                                    )     11-1144-REL-SSA
CAROLYN W. COLVIN, Acting           )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Terry Jones seeks review of the final decision of the Commissioner of Social
Security denying plaintiff's application for disability benefits under Title II of the Social
Security Act ("the Act"). Plaintiff argues that the ALJ erred in finding plaintiff's testimony that
she suffers from bilateral arm limitations not credible, and as a result erred in finding that
plaintiff can perform her past relevant work which requires frequent use of both arms. I find
that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's
is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the
decision of the Commissioner will be affirmed.

## I.     BACKGROUND

On July 9, 2009, plaintiff applied for disability benefits alleging that she had been
disabled since June 30, 2009. Plaintiff's disability stems from arthritis, high blood pressure,
asthma, high cholesterol, and fibromyalgia. Plaintiff's application was denied. On February
15, 2011, a hearing was held before an Administrative Law Judge. On March 8, 2011, the
ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 21,
2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the
ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5.     Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

3

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert Jennifer Ruhnke, in addition to documentary evidence admitted at the hearing.

## A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record shows that plaintiff earned the following income from 1971 through 2009:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1971 | $ 331.20 | 1991 | $ 17,932.59 |
| 1972 | 366.40 | 1992 | 18,979.78 |
| 1973 | 0.00 | 1993 | 19,189.60 |
| 1974 | 0.00 | 1994 | 21,107.81 |
| 1975 | 0.00 | 1995 | 20,321.11 |
| 1976 | 0.00 | 1996 | 21,319.92 |
| 1977 | 2,412.18 | 1997 | 21,945.31 |
| 1978 | 5,879.80 | 1998 | 20,315.32 |
| 1979 | 6,339.55 | 1999 | 23,237.17 |
| 1980 | 8,049.20 | 2000 | 24,028.19 |
| 1981 | 9,461.64 | 2001 | 19,259.12 |
| 1982 | 12,052.40 | 2002 | 23,654.90 |
| 1983 | 13,023.22 | 2003 | 27,394.19 |
| 1984 | 13,570.21 | 2004 | 28,734.85 |
| 1985 | 14,343.89 | 2005 | 28,413.58 |
| 1986 | 14,648.83 | 2006 | 29,704.09 |
| 1987 | 13,727.45 | 2007 | 31,467.35 |
| 1988 | 16,254.57 | 2008 | 31,526.95 |
| 1989 | 14,560.58 | 2009 | 16,325.52 |
| 1990 | 16,109.86 | | |

(Tr. at 129).

Case 4:11-cv-01144-REL   Document 16   Filed 03/23/13   Page 4 of 34

### Disability Report - Field Office

On July 9, 2009, M. Lavery met face to face with plaintiff and observed that plaintiff had no difficulty with concentrating, sitting, standing, walking, using her hands or writing (Tr. at 146).

### Disability Report - Adult

In a Disability Report plaintiff stated that she suffers from arthritis, high blood pressure, asthma, high cholesterol, and fibromyalgia (Tr. at 149). When asked to state how her condition affects her ability to work, she wrote, "Anything with repetitive motion hurts the muscles in my right shoulder." Plaintiff reported that she last worked on June 30, 2009, and that she stopped working because, "The office closed and I lost my job."

### Work History Report

In a Work History Report dated August 28, 2009, plaintiff described her job as an office assistant as requiring two hours of walking per day; one hour of standing; five hours of sitting; one hour of handling, grasping, or grabbing large objects; and four hours of writing, typing or handling small objects (Tr. at 161). She lifted less than ten pounds.

### Function Report - Adult

In a Function Report dated August 28, 2009, plaintiff indicated that she cuts the grass, takes care of a dog, prepares her meals, washes dishes, vacuums, dusts, and does laundry (Tr. at 167-174). Cutting the grass takes 2 1/2 to 3 hours and she uses a splint on her left hand. She spends an hour and a half ironing each week. She folds clothes for 30 minutes. She vacuums for 30 minutes, and dusts for 30 minutes. These chores are done once a week. Plaintiff drives, she shops in stores for food and cleaning supplies. She plays Sudoku and watches television. She talks on the phone daily, goes to church weekly, and visits with

friends and goes to lunch every two to three weeks.  She has no problems getting along with others.

Plaintiff's condition affects her ability to lift, squat, bend, reach, walk, sit, kneel, climb stairs, and use her hands.  She is unable to lift heavy objects with her left hand, and her right hand hurts when she uses it too much.  Her conditions do not affect her ability to stand.  She can pay attention as long as she needs to, she finishes what she starts, and she can follow instructions well.

Plaintiff does not handle stress well -- her blood pressure goes up and she gets a headache.

When she uses a weed eater, plaintiff's thumbs hurt.

**Function Report - Third Party**

In a Function Report completed by plaintiff's daughter on August 29, 2009, she reported that plaintiff takes care of her dog, searches for jobs on the internet, vacuums and dusts, cuts grass, and washes dishes (Tr. at 181-188).  She prepares her own meals, cleans, does laundry, irons, drives, and shops in stores.  She plays Sudoku, watches television, reads the Bible, and goes to church.  She talks on the phone, runs errands, and visits with others.

**Missouri Supplemental Questionnaire**

In  Missouri Supplemental Questionnaire dated August 28, 2009, plaintiff reported that she is able to use a computer for two hours at a time (Tr. at 175-177).

**B.      SUMMARY OF MEDICAL RECORDS**

On March 4, 2008, plaintiff was seen at St. Luke's Outpatient Rehabilitation for fitting of a splint for her left thumb due to degenerative joint disease (Tr. at 257-258).  She reported that her symptoms had been present for five years, or since approximately early 2003.

6

Plaintiff's dominant hand is her right. No other therapy was prescribed. "Patient has met goals."

On August 4, 2008, plaintiff saw Linda Singh, M.D., for a follow up on lipids, hypertension, and asthma (Tr. at 277-278). She reported that Singular was working well for her asthma.

On August 20, 2008, Chris Maeda, M.D., an orthopedic surgeon, wrote a letter to Dr. Singh (Tr. at 297-298). Plaintiff had reported thumb pain, left worse than the right. The pain had been present for four years, or since approximately late 2004. She was using over-the-counter Aleve and a thumb splint. Dr. Maeda observed tenderness in the thumb joint, more so on the left hand than the right. She had crepitus[1] and pain in her left thumb; no crepitus and just "a little pain" in her right thumb. She had full range of motion in both wrists, full grip and release function in both hands. X-rays revealed osteoarthritis in her left thumb. Plaintiff reported that she had already tried conservative treatment and cortisone injections and wanted to have surgery. Dr. Maeda referred her to a hand surgeon.

On September 23, 2008, plaintiff saw Scott Langford, M.D., at Rockhill Orthopaedics (Tr. at 216-218). Plaintiff complained of pain and swelling in her left thumb that had been going on for about six years, or approximately since late 2002. She denied any right-sided symptoms. She had previously gotten cortisone injections "which helped initially. She denies any other treatment for this problem." Plaintiff reported living alone, she was a non-smoker and non-drinker, and she exercised. X-rays revealed "rather marked" arthritic changes of the

---

[1]A clicking sound often heard in movement of joints, for example, in temporomandibular joint resulting from joint irregularities.

thumb. She was assessed with arthritis of her thumb CMC joint.[2] Her STT joint (wrist), MCP joint (metacarpophalangeal joint, also called "MP" joint), and IP joint[3] (interphalangeal joint) were "relatively normal."

I discussed the situation with the patient in detail. I explained to her that her options are to live with this the way it is versus therapy and splinting versus another cortisone injection. She tells me that she has been wearing splints on her thumb for six years and that injections have helped, but they do not provide lasting relief. Another option is to consider a CMC arthroplasty.[4] I explained to her that I believe that she is a little young for this. She will definitely need to have this revised at some [point] in her life if she lives long enough. There is always the possibility that the arthroplasty may not help her pain. I warned her about the long recovery time. It generally is three months before she can recover most use of her thumb and six months to a year until the thumb recovers as much as it is going to recover. I would not expect her thumb to be pain free. She voices understanding of all these ideas and tells me that she would like to go ahead with surgery.

---

2



CMC (Basal) Joint Arthritis

First metacarpal of the thumb

Carpometacarpal joint

Trapezium (Carpal bone of the wrist)

3



4



8

On October 27, 2008, plaintiff saw Dr. Singh and reported that she was planning to have surgery on her left thumb (Tr. at 275-276). She was assessed with hypertension, gastroesophageal reflux disease ("GERD"), and hyperlipidemia (high cholesterol).

On November 3, 2008, plaintiff underwent left thumb CMC joint arthroplasty, performed by Scott Langford, M.D. (Tr. at 213-215).

On November 13, 2008, plaintiff returned to Dr. Langford's office for a follow up (Tr. at 211). Plaintiff was doing fairly well and she denied any problems. Plaintiff's sutures were removed and a thumb cast was put into place.

On December 4, 2008, plaintiff saw Dr. Langford for a follow up (Tr. at 209). Plaintiff was doing very well but reported some sharp pains at times when using her fingers. Dr. Langford told her to be very careful and not do any heavy gripping or lifting.

The following day, plaintiff began physical therapy (Tr. at 254-255). She reported that her symptoms began eight years earlier, or approximately late 2000. At rest her pain was 0/10. With wrist rotations and at its worst, her pain was a 5/10.

On January 5, 2009, plaintiff saw Dr. Langford for a follow up (Tr. at 208). "Most of the days her pain is quite minimal. It would seem that her thumb is doing considerably better than it was prior to surgery." Plaintiff reported wearing her splint as directed and participating in physical therapy. The note states in bold, "At the patient's request we have written a note stating: no lifting greater than 5 lbs with the left hand."

On February 2, 2009, Dr. Langford saw plaintiff for a follow up (Tr. at 207). Plaintiff was doing very well and denied any problems. She had no tenderness, good range of motion, good flexion with the thumb MCP joint. She had tenderness to firm palpation over the thumb CMP joint, "which is to be expected. . . . I would expect her symptoms should continue to improve. She can ease out of using the splint. She tells me that her thumb is already 50%

9

than it was prior to surgery. This is great news. She wants to continue therapy and I made an order to this effect." Absent any problems, plaintiff needed no further follow up with Dr. Langford.

Plaintiff continued with therapy until March 27, 2009, when she was discharged (Tr. at 242-243). On that date she reported her pain a 0/10. "Pt. has no concerns." She was released to return to work with no restrictions.

On April 20, 2009, plaintiff saw Dr. Singh for a follow up on her hypertension (Tr. at 269-270). She complained of left hip pain which she had experienced off and on for the past three years. Dr. Singh noted arthralgia of the left hip, which means non-inflammatory joint pain as opposed to arthritis which is inflammatory joint pain. She noted tenderness in the left hip bursa area.[5] She assessed left hip pain and ordered an x-ray. She noted that plaintiff's hypertension and hyperlipidemia were stable. That same day, an x-ray of plaintiff's left hip

---

[5]

showed mild hips and sacroiliac joint[6] osteroarthrosis[7] and greater trochanteric[8] enthesopathy (a disease occurring at the site of attachment of muscle tendons and ligaments to bones or joint capsules) (Tr. at 287). X-rays of plaintiff's right shoulder taken on the same day showed mild degenerative changes at the acromioclavicular joint[9] (Tr. at 285). The assessment was

---

[6]


[7]Osteoarthrosis is a common disorder of synovial joints, seen most often in older patients. The joints affected most commonly are the knee, hip, hands and the first metatarsophalangeal joint. Involvement of other joints such as the ankle, wrist and shoulder is uncommon, and suggests a secondary etiology. Although osteoarthrosis may be present in many joints, symptoms are usually evident in one or two joints at the most. The three main symptoms are pain, morning stiffness and a tendency for the affected joint to gel with immobility. Treatment includes rest; weight loss; physiotherapy; aids such as canes, shoe lifts, and elastic knee supports; and judicious use of anti-inflammatory medications.

[8]


[9]


11

mild arthritis of the left hip and right shoulder (Tr. at 286).

On June 4, 2009, plaintiff went to St. Luke's Outpatient Rehabilitation for physical therapy evaluation of her left hip pain, which she said she had had for years with increased pain the last four or five months (Tr. at 222-229). "Sometimes cannot walk 1 block without pain." She reported no pain with sitting, although with prolonged sitting, it would "stiffen up" (Tr. at 222-224). The pain did not interfere with her sleep. The physical therapist recommended heat, ice, and ultrasound. Plaintiff was also evaluated for her right shoulder pain. She reported a gradual onset of shoulder pain over the past five years and said her pain was variable depending on her activity level.

On June 18, 2009, plaintiff's physical therapist noted that her hip pain was rated a 5/10 at its worst and a 0/10 at its best (Tr. at 326). She rated her shoulder pain a range of 7/10 to 3/10 but reported a 10% improvement since beginning physical therapy. The therapist found range-of-motion limitations and some continued weakness in the right shoulder and decreased hip strength with complaints of pain in the left hip.

On June 19, 2009, plaintiff saw Dr. Singh and reported that she continued to have hip and shoulder pain despite physical therapy and requested injections (Tr. at 265-266). Dr. Singh assessed hypertension, left hip bursitis/arthritis, and right shoulder degenerative joint disease.

June 30, 2009, is plaintiff's alleged onset date.

On September 21, 2009, plaintiff saw Dr. Singh for a follow up on hypertension and complained of numbness in her fingers (Tr. at 336-337). She ordered x-rays of plaintiff's neck and right thumb which showed mild degenerative disc disease at C5-6 and early degenerative arthrosis (disease of a joint) in the thumb's IP joint (see footnote 3 on page 8) (Tr. at 338).

On September 30, 2009, Ann Warner, M.D., a rheumatologist, evaluated plaintiff at the request of Dr. Singh (Tr. at 349-350).  On October 2, 2009, she wrote a letter to Dr. Singh.

> The lateral left hip pain is exacerbated by walking and lying on her left side.  Stairs are very difficult for her.  The pain does not radiate into her low back or down her leg.  The right shoulder pain is exacerbated by abduction and internal rotation.[10]  Sometimes, it hurts to lie on her right shoulder at night.  She has not improved with two months of physical therapy, but finds ibuprofen (which she takes at a dose of anywhere from 800 to 3200 mg per day) somewhat helpful.

> . . . Past medical history includes . . . left 1st CMC tendon interposition arthroplasty in 2008 (did not help). . . .  She has tried Tramadol and Tylenol in the past without success.

> She used to work for Saint Luke's Family Care in checkout and medical records.  She got laid off when the practice was closed.  She does not exercise. . . .

> . . . She says she has been experiencing quite a bit of stress lately, in no small part because she lost her job. . . .  She does not have significant peripheral edema.[11]  On musculoskeletal examination, she has diffuse allodynia[12] of varying severity, worst at the greater trochanters [see footnote 8, page 11], and in fact much more striking at the right greater trochanter than the left.  She has pain on full range of motion of the right shoulder. . .  She is tender over the convexity of the right shoulder.  On hip range of

---

[10]



[11]Edema is a condition of abnormally large fluid volume in the circulatory system or in tissues between the body's cells (interstitial spaces).  Normally the body maintains a balance of fluid in tissues by ensuring that the same amount of water entering the body also leaves it.  The circulatory system transports fluid within the body via its network of blood vessels.  The fluid, which contains oxygen and nutrients needed by the cells, moves from the walls of the blood vessels into the body's tissues.  After its nutrients are used up, fluid moves back into the blood vessels and returns to the heart.  In edema, either too much fluid moves from the blood vessels into the tissues, or not enough fluid moves from the tissues back into the blood vessels.  This fluid imbalance can cause mild to severe swelling in one or more parts of the body.  Peripheral edema means the swelling occurs in the extremities.

[12]Pain due to a stimulus that does not normally cause pain.

13

motion, she has pain in the right groin with flexion,[13] and flexion is limited to 90 degrees (125 is normal) because of guarding.[14]  She has pain in the low back with abduction of the right hip.  The left hip has a full and apparently pain-free range of motion. The knees, ankles, and feet are unremarkable.

X-rays of the hips and shoulders are normal. . . .

Terry appears to have right subacromial and bilateral trochanteric bursitis.[15]  Her pain may be accentuated by stress and depression.

Dr. Warner gave plaintiff corticosteroid injections and "strongly recommended that Terry begin a regular exercise problem, which may help some of her fibromyalgia-like pain and perhaps even assuage her stress to some extent."

On November 29, 2009, plaintiff saw Dr. Singh who, during an exam, found that plaintiff's musculoskeletal system was normal (Tr. at 372-373).  She had no edema.  Dr. Singh assessed hypertension, Asthma, GERD, Degenerative Joint Disease, and Hyperlipidemia, all "stable" (Tr. at 373).

---

[13]



[14]A sign detected during physical pain whereby the patient involuntarily contracts muscles second to pain.

[15]"Bursitis is a painful condition that affects the small fluid-filled pads -- called bursae -- that act as cushions among your bones and the tendons and muscles near your joints.  Bursitis occurs when bursae become inflamed.  The most common locations for bursitis are in the shoulder, elbow and hip. . . . Bursitis often occurs near joints that perform frequent repetitive motion.  Treatment typically involves resting the affected joint and protecting it from further trauma.  In most cases, bursitis pain goes away within a few weeks with proper treatment, but recurrent flare-ups of bursitis are common."
http://www.mayoclinic.com/health/bursitis/DS00032

14

On July 27, 2010, plaintiff saw Dr. Singh complaining of right middle finger pain for the past six weeks (Tr. at 370-371). Plaintiff also reported that someone from the Department of Social Services had recommended that plaintiff see a psychologist for anger management. "Pt. had applied for disability." Plaintiff was observed to be tearful during the exam. She was assessed with depression and fibromyalgia; however, the only physical exam that was performed was "General appearance: Normal. Tearful" and a notation that the PIP joint[16] of plaintiff's middle finger was tender. She ordered an x-ray of plaintiff's middle finger. No treatment plan was listed for either diagnosis of depression or fibromyalgia. The finger x-ray revealed mild soft tissue swelling (Tr. at 377).

On September 27, 2010, plaintiff returned to see Dr. Singh and complained of continued pain in her right middle finger, and "now L middle finger is hurting" (Tr. at 368-369). Plaintiff reported no relief with Ibuprofen. "Filed for disability for other reasons." Dr. Singh noted that plaintiff's exam was normal except tenderness and mild swelling in her finger. She assessed arthralgias in multiple sites and asthma. She prescribed Tramadol[17] and noted that plaintiff's rheumatoid factor[18] was "weakly positive."

---

[16] 

[17]Also called Ultram, Tramadol is a narcotic-like pain reliever.

[18]A rheumatoid factor test measures the amount of rheumatoid factor in the blood. Rheumatoid factors are proteins produced by the immune system that can attack healthy tissue in the body. High levels of rheumatoid factor in the blood are most often associated with autoimmune diseases, such as rheumatoid arthritis and Sjogren's syndrome. But rheumatoid factor may be detected in some healthy people.

Case 4:11-cv-01144-REL   Document 16   Filed 03/23/13   Page 15 of 34

On October 26, 2010, plaintiff saw Dr. Singh for a follow up (Tr. at 365-366). Plaintiff said that she was losing her insurance and so she was planning to go to a different clinic. Dr. Singh noted that plaintiff was "currently experiencing symptoms" of fibromyalgia and was being treated with Tramadol. Plaintiff complained of bilateral shoulder, bilateral PIP (finger), bilateral hip and bilateral knee joint pain. She reported that non-steroidal anti-inflammatories caused GI upset. Plaintiff's physical exam was all normal, including her joints, bones, and muscles. Her anti-CCP level[19] was noted to be normal. She was assessed with arthralgias in multiple sites, asthma (asymptomatic), fibromyalgia, and osteoarthritis of multiple sites. She was continued on the same dose of Tramadol.

## C.    SUMMARY OF TESTIMONY

During the February 15, 2011, hearing, plaintiff testified; and Jennifer Ruhnke, a vocational expert, testified at the request of the ALJ.

### 1.    Plaintiff's testimony.

Plaintiff lives alone in a house (Tr. at 25). She was 55 at the hearing and is now 57 (Tr. at 25). Plaintiff graduated from high school and was subsequently trained to be a certified nurse assistant (Tr. at 26). Plaintiff is five feet tall and weighs about 168 pounds (Tr. at 27). She is right-handed (Tr. at 27).

Plaintiff worked as a CNA for about 22 years up until 2000 (Tr. at 31). Plaintiff's last job was office assistance and check-out, a clerical position at St. Luke's Family Care (Tr. at 32). She checked people out, made the return appointments, made reminder calls for upcoming appointments, and called patients to reschedule appointments (Tr. at 32). Plaintiff performed that job for seven years, and the job ended in June 2009 because, "They shut it down." (Tr. at

---

[19]Anti-CCP, which stands for anti-cyclic citrullinated peptide antibody, is a blood test which helps confirm a diagnosis of rheumatoid arthritis.

Case 4:11-cv-01144-REL    Document 16    Filed 03/23/13    Page 16 of 34

33, 51). In total, she worked at St. Luke's for 29 1/2 years (Tr. at 49). If they had not "shut down" her job, she would have continued working that job "as long as [she] could" (Tr. at 51). However, she would not have been able to do the job because she was tired: "My mind's tired. My body's wore out. I was just tired. I'm serious." (Tr. at 52).

In her clerical position, plaintiff used a computer to make appointments, but did not really do much typing (Tr. at 50). She wrote notes for doctors (Tr. at 50). Plaintiff did no overhead reaching in that job (Tr. at 51). She was able to get up and walk around when she needed to (Tr. at 51).

Plaintiff had problems at work every day before the job ended (Tr. at 33). She had continuous pain, knots and muscle spasms in her right shoulder (Tr. at 33). Despite the pain, she said, "I had to do what I had to do" (Tr. at 33). Plaintiff was asked how her right shoulder interfered with her ability to do her job, and she said she was able to do the job, but she had to do it with severe pain (Tr. at 33). When asked why she could not do that job today, plaintiff said, "I'm tired of being in pain every day. I have been in pain for so many years. I'm tired." (Tr. at 33).

> Q.   Okay. But you worked with the pain before it shut down so why can't you do it now?
>
> A.   Because they're so fast-paced, they -- you know, like I checked into trying to find something like I did, but they want you to do check-in; they want you to do check-out; they want you to do medical records; they want you to do everything, you know, reminder calls, everything, and it's fast-paced and I can't do it. It runs my blood pressure up. It's just stressful.

(Tr. at 33-34).

Plaintiff also has pain in her left shoulder (Tr. at 36).  She had a right rhomboidectomy[20] in approximately 2005 despite there being only a 50% chance of success -- plaintiff's surgery did not help her (Tr. at 36).  Plaintiff cannot reach overhead with her right arm (Tr. at 36).

Plaintiff's job was performed sitting but she could get up and walk around whenever she needed (Tr. at 34).  Plaintiff cannot perform a sit-down job because it is hard on her hips (Tr. at 34).  She has arthritis in her hips and knees and it is painful for her to get up after sitting (Tr. at 34).

Plaintiff has osteoarthritis in her hands, and she had a bone removed from her left hand (Tr. at 34-35).  Plaintiff has problems with both her hands (Tr. at 35). She will sometimes drop things, and she does not have a good grip (Tr. at 35).  Plaintiff's doctor said if her right hand "gets bone-on-bone" he would do surgery on that hand too, but plaintiff does not want to have surgery on her right hand because it hurts too much and there is still pain afterward (Tr. at 35).  Plaintiff had therapy for her hand after the surgery for about three months in 2008 or 2009 (Tr. at 38).  Plaintiff also had an injection in her left hand sometime around 2004 (Tr. at 38-39).  She has had no treatment on her hands since 2009 (Tr. at 51).

---

[20]I have not been able to determine what a rhomboidectomy is; however, the rhomboid muscles are in the shoulder blade.



Plaintiff had plantar fasciitis surgery on her right foot in approximately 2000 (Tr. at 37).

Dr. Box, a rheumatologist, diagnosed fibromyalgia (Tr. at 40).

Plaintiff has arthritis in her neck (Tr. at 54). That was diagnosed after an x-ray in approximately 2007 (Tr. at 54). She has had no treatment on her neck (Tr. at 55). Plaintiff had been taking Ibuprofen for her arthritis, but she was switched to Tramadol in approximately August 2010 (Tr. at 55). Despite that, the pain never goes away (Tr. at 55).

Plaintiff had a worker's compensation injury in 1986 when she hurt her right lower back; she had another in 2000 when she hurt her right shoulder (Tr. at 37). Her back pain still flares up two or three times a week (Tr. at 37). Sitting too long will aggravate her back pain (Tr. at 37).

Since her alleged onset date, plaintiff has had injections in her right shoulder and both hips (Tr. at 39, 51). Dr. Warner gave her the injections (Tr. at 39). She does not see Dr. Warner anymore because she does not have insurance (Tr. at 39). Plaintiff saw Dr. Singh last in October 2010 (Tr. at 40). She now goes to a clinic called Truth & Mercy (Tr. at 39).

Plaintiff takes Tramadol for her pain, but it does not really help (Tr. at 40). She told Dr. Singh it was not helping with her pain, but she did not do anything about that (Tr. at 40). She used to take 800 mg of Ibuprofen four times a day when she saw Dr. Box, but Dr. Singh said it was bad for her blood pressure and her stomach so she was told to reduce that to twice a day (Tr. at 41). Plaintiff's pain increased, and Dr. Singh told her to stop taking Ibuprofen and start taking Diclofenac (Tr. at 41). Then plaintiff saw on television that it can cause a heart attack (Tr. at 41). She told her doctor that she did not want to take any more medicines dealing with inflammation because she had had a bad reaction to Vioxx (Tr. at 41).

19

Plaintiff has swelling in her joints and pain, but she takes no medication for fibromyalgia (Tr. at 41). She is only taking Tramadol (Tr. at 41). Plaintiff's doctor recommended Lyrica, but "there's too many side effects. I heard on TV about that too. I'm just leery of any medicine dealing with that from -- since I had the Vioxx reaction." (Tr. at 41, 52). Plaintiff's fibromyalgia prevents her from working because she is sore all the time (Tr. at 41). Plaintiff does not exercise for her fibromyalgia despite her doctor's recommendation because she cannot afford it (Tr. at 41). Her doctor has only suggested water aerobics, and she does not have money for that (Tr. at 52). Her fibromyalgia diagnosis was in 2000 (Tr. at 52). She tried different medications, but then she just took Ibuprofen for years (Tr. at 53).

Plaintiff has asthma and uses a ProAir inhaler and takes Singular (Tr. at 42). Plaintiff has not been to an emergency room because of asthma (Tr. at 42). She does not smoke (Tr. at 42). She was diagnosed with asthma in 2002, and she can work despite her asthma (Tr. at 53). She has flare-ups about three times a year and uses breathing treatments then (Tr. at 53).

Plaintiff's medication keeps her blood pressure under control until she gets upset and stressed out (Tr. at 43, 54). Working was stressful (Tr. at 43). Now that she is not working, it is still stressful because she has no money for medication (Tr. at 43). One time she had to leave work because her blood pressure was so high, but since she has been at home and stays calm, her blood pressure is okay (Tr. at 54).

Plaintiff gets her medication through Truth & Mercy -- with them she can get her medicine from WalMart for $10 for a 90-day supply (Tr. at 43). She was approved to get her Singular for a year for free instead of paying $109 a month (Tr. at 43).

Plaintiff can walk a block sometimes, but other times she cannot even walk that far due to hip pain (Tr. at 44). She can stand for about 15 minutes before she starts getting a tingling

20

feeling in her feet (Tr. at 44). Plaintiff lost 50 pounds during 2010 thinking it would improve her hip pain, but it did not (Tr. at 44-45). She can sit for an hour, but when she gets up her hips hurt; she has to use her hands to push herself up and that makes her hands and shoulders hurt (Tr. at 45). Plaintiff tries not to lift anything over 64 ounces because it is hard for her (Tr. at 45). She has a pitcher that holds 64 ounces and that is what she lifts (Tr. at 45). She said she could comfortably lift and carry five pounds (Tr. at 56). When plaintiff writes, her middle finger joint gets tired and swollen; and trying to button clothing is also hard because it hurts her hand (Tr. at 45).

Plaintiff lies down for 30 minutes a day to give her back a rest (Tr. at 46). Tramadol, which she takes four times a day, makes her sleepy (Tr. at 46). "Then sometimes, I might lay down for two hours or something like that." (Tr. at 46).

Plaintiff lives alone and does her own cooking and cleaning (Tr. at 46). She cooks for three days at a time (Tr. at 46). She may bake chicken in the oven in an aluminum pan (Tr. at 46). She vacuums with a self-propelled vacuum cleaner (Tr. at 46). Plaintiff can do grocery shopping alone, but sometimes her daughter comes with her to lift heavy things (Tr. at 47).

Plaintiff can drive, but sometimes her hip bothers her and her shoulders hurt to turn the steering wheel, but she does okay most days (Tr. at 47, 57). Plaintiff's house has stairs to the basement and three steps in the front of the house (Tr. at 47). She tries to avoid stairs because it hurts her hips (Tr. at 47).

On a typical day, she gets up at 8:30 or 9:00, sits on the side of the bed, rotates her shoulders and "let[s] everything kind of fall in place" (Tr. at 48). That takes about 15 minutes (Tr. at 48). Then she uses the bathroom and washes her face (Tr. at 48). She uses a battery-operated toothbrush because of her hands (Tr. at 48). She makes coffee, sits at the table and drinks that and has a banana with her medicine (Tr. at 48). Plaintiff has no hobbies, and the

only activity she has outside the home is attending church services (Tr. at 48). She can sit through a service because she "can turn and get up and down" when she needs to (Tr. at 48). Plaintiff has a self-propelled lawn mower, and she mows half her yard one day and the other half another day (Tr. at 49). She mows her yard once a week (Tr. at 56).

Plaintiff was asked to describe her biggest impediment to working (Tr. at 57). She said, "My shoulders and my hands and stress on the job, my blood pressure." (Tr. at 57).

## 2.   Vocational expert testimony.

Vocational expert Jennifer Ruhnke testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes nurse assistant, DOT 355.674-014, with an SVP of 4,[21] and it is a medium-exertion job (Tr. at 59). She has worked as an appointment clerk, DOT 237.367-010, which is sedentary with an SVP of 3 (Tr. at 59).

The first hypothetical involved a person who can do the full range of sedentary work except she would need to be in an environment free of smoke, dust, pollutants, odors; she would need to avoid all temperature extremes; she could do no repetitive overhead lifting or reaching with the right arm and no lifting from floor level with the right arm; she could occasionally bend and use her hands; she could do no crawling, kneeling, crouching or squatting; and she could require no fine dexterity with the left hand (Tr. at 60). The vocational expert testified that such a person could not do plaintiff's past relevant work.

---

[21]"Specific Vocational Preparation," SVP is the amount of time needed to learn the techniques, acquire the information, and develop the facility for average performance in a specific job-worker situation. SVP comes from vocational education, civilian, military, and institutional work experience, apprenticeship, and from in-plant and on-the-job training. An SVP of 4 means it takes about three to six months to learn to do the job. An SVP of 3 means it takes more than 30 days and up to three months to learn to do the job.

22

The second hypothetical was the same as the first except the person could frequently use her hands (Tr. at 61). The vocational expert testified that such a person could perform plaintiff's past work as an appointment clerk (Tr. at 61).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge William Horne entered his opinion on March 8, 2011 (Tr. at 11-19).

Step one.  Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 12).

Step two.  Plaintiff suffers from the following severe impairments:  history of left thumb CMC arthroplasty/suspensionplasty in November 2008; mild left hip and sacroiliac joint osteoarthrosis of the left hip on x-ray findings; mild acromioclavicular joint osteoarthrosis of the right shoulder on x-ray findings; mild degenerative disc disease of the cervical spine on x-ray findings; asthma; and history of fibromyalgia. Claimant's history of hypertension and hyperlipidemia were considered in the combination of impairments, but were found to be not severe (Tr. at 12).

Step three.  Plaintiff does not have an impairment or combination of impairments that meets or equals a listed impairment (Tr. at 12).

Step four.  Plaintiff retains the residual functional capacity to perform sedentary work, i.e., lifting up to 10 pounds, sitting up to 6 hours in an 8-hour workday, and standing and/or walking up to 2 hours in an 8-hour workday.  She requires a relatively clean work environment, free of excessive dust, smoke and other harmful irritants.  She should also have no exposure to extremes of temperature or humidity.  Plaintiff cannot repetitively lift or reach overhead with the right upper extremity and cannot lift from floor level.  She can occasionally bend, but can never crawl, kneel, crouch, or squat.  Plaintiff can frequently use her upper

23

extremities bilaterally (Tr. at 17). Plaintiff's past relevant work consists of nurse assistant, a medium, semi-skilled job; and appointment clerk, a sedentary semi-skilled job (Tr. at 12). With her residual functional capacity, she can perform her past relevant work as an appointment clerk (Tr. at 18).

## VI.   CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony that she has difficulty using her arms and hands was not credible.

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to

such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> At the hearing, claimant testified that her job at St. Luke's Family Care ended in June 2009 because of a job shut down. When asked whether she was having any problems performing the job before the employer shut down, claimant noted that she was having severe right shoulder pain and spasm every day on that job. When asked why she believed she could not perform similar employment now, claimant stated that she had checked out such employment, but found that these jobs were extremely fast paced and the employers expected employees to do "everything," i.e., check in, medical records, etc., and she could not perform all of those tasks. Claimant, overall, testified that she could not perform even a sit/stand option sedentary job at present because of the severe arthritis in her hips, as well as her severe hand osteoarthritis. Herein, claimant stated that she had undergone surgery to her left hand to remove a bone, but continued to have problems with the left hand with respect to gripping and grasping. Additionally, claimant testified that she had problems with gripping and grasping with her right dominant hand as well, albeit she had had no surgery to her right hand. When asked whether surgery was anticipated to the right hand, claimant stated that her treating physician had not recommended any such surgery as yet. Moreover, claimant noted that she did not want any further hand surgery because of the pain involved and because the left hand surgery had not helped that much.
>
> * * * * *
>
> Claimant also testified that she had been diagnosed with fibromyalgia by a rheumatologist, but was not taking any medication for this condition such as Lyrica because of the adverse side effects associated with that medication. When asked whether she took any pain medication, claimant stated that she did, albeit it did not help her pain symptoms very much. Overall, claimant stated that her fibromyalgia

25

would interfere with her ability to work. When asked whether she had followed the recommendations by her doctor to undergo an exercise program and/or water aerobics for her fibromyalgia, claimant testified that she was not able to afford such treatment. . . .

* * * * *

The Administrative Law Judge finds claimant's subjective allegations of disability not credible or supported by the totality of the evidence. In evaluating credibility, an Administrative Law Judge will consider a claimant's work history and activities of daily living, as set out in the regulations.

Regarding claimant's employment record, the undersigned notes that an earnings query . . . shows a stable work history for claimant.

With respect to activities of daily living, claimant testified that she did her own cooking and cleaning. Additionally, claimant stated that she was able to vacuum with a self-propelled vacuum cleaner. Overall, claimant noted that she did "ok" with respect to household chores. Claimant further testified that she did her own shopping, albeit her daughter would sometimes go with her and help her lift the heavy items. She also stated that she was able to drive, "most days." Claimant noted no problems with respect to caring for her personal needs. Regarding social activities, claimant testified that she went to church and was able to sit through the church service without problems. When asked whether she did any outside chores, claimant stated that she mowed the lawn with a self-propelled mower, mowing part of the lawn day one day and the other part the next day.

In a third party activities report completed by claimant's daughter in August 2009, it was noted that a typical day for claimant consisted of drinking coffee and eating breakfast in the morning, taking her medication, resting, bathing, watching television, feeding the dog, job hunting on the Internet, vacuuming once a week, dusting, cutting the grass once a week, eating dinner, and washing the dishes. Claimant reportedly was able to drive and shop in stores and via computer. She was also able to pay bills, handle a savings account, count change, and use a checkbook. Hobbies/interests for claimant, according to that report, consisted of watching sports, reading the Bible, and going to church. It was noted that claimant had no problems getting along with family, friends, neighbors, or others.

While a claimant need not be bedridden to be found disabled, her daily activities can be seen as inconsistent with subjective symptoms precluding all types of work. The undersigned, overall, finds that claimant's activities during the period at issue, as noted at the hearing and in the record and as previously referenced, are not consistent with allegations of a debilitating medical condition.

The regulations state that an Administrative Law Judge may properly discount subjective complaints where there are inconsistencies in the record as a whole. Although claimant testified to some severe orthopedic symptoms at the time of the hearing, she has had very sporadic medical treatment with respect thereto during the

26

period at issue. Specifically, there are no records of any ongoing physical therapy, pain management, epidural injections, use of a TENS unit, etc. for her during said period. There are also no frequent hospital emergency room visits or inpatient hospitalizations for claimant.

Although there was reference at the hearing of claimant not following through with some recommended medical treatment because of a lack of resources and medical insurance, the undersigned notes that a lack of financial resources and/or medical insurance is not always an excuse for failure to seek treatment. Case law has held that the commissioner is justified in finding that claimant's financial hardship is not cause enough to justify her failure to seek medical attention when she was unable to qualify for a Medicaid card; there was no evidence that she sought to obtain any low-cost medical treatment from her doctor or from clinics and hospitals; and there was no evidence that she was denied medical care because of her financial condition. Social Security Ruling 82-59 also provides that a claimant must exhaust all free or subsidized sources of treatment and document her financial circumstances before an inability to pay would be considered good cause for failure to follow through with treatment.

* * * * *

On November 13, 2008, it was reported that claimant was 10 days out from her left hand surgery and she was generally doing fairly well, denying any problems. X-rays taken of claimant's left thumb at that time showed her thumb to be nicely in position and the pisiectomy looked good. On January 5, 2009, it was reported that claimant was about 9 weeks out from her left hand surgery and most of the days her pain was quite minimal. Examination of the left thumb at that time revealed the incision to be healing nicely and there was no sign of infection or problem. Claimant had a good radial artery pulse and she had no hyperextension of the thumb MCP joint. There was negative grind test for the thumb CMC joint and claimant had good sensation over the dorsoradial aspect of the hand.

Claimant's left hand surgery appears to have been successful, according to the follow-up treatment records, as noted, and claimant has not undergone any further treatment with respect to her alleged left hand complaints. With respect to claimant's right shoulder and left hip complaints, the record reflects physical therapy for these problems, in June 2009. However, overall claimant's treatment with respect to her right shoulder and bilateral hips has been minimal. Moreover, x-rays taken of claimant's left hip and right shoulder have shown only mild osteoarthrosis. X-rays taken of claimant's left hand taken in September 2009 showed early degenerative arthrosis of the IP joint of the left thumb. X-rays taken of claimant's cervical spine showed only mid degenerative disc disease at the C5-6 disc level.

In a report dated October 2, 2009, Dr. Warner stated that x-rays of claimant's hips and shoulders were normal. On examination at that time, claimant reportedly had no cervical or supraclavicular lymphadenopathy. Claimant had pain on full range of motion of the right shoulder, without palpable or audible crepitus. Although claimant had pain in the lower back with abduction of the right hip, her left hip had a full and apparently pain-free range of motion. Claimant's knees, ankles and feet were

27

unremarkable. Overall, Dr. Warner noted that claimant appeared to have right subacromial and bilateral trochanteric bursitis and her pain might be accentuated by stress and depression. Dr. Warner further reported that she performed local corticosteroid injections in the right subacromial bursa and bilateral trochanteric bursae at that time, and she strongly recommended that claimant begin a regular exercise program.

It is noted that laboratory findings have shown no active rheumatoid arthritis for claimant. The last treatment records for 2010 overall show no significant orthopedic findings for claimant. Although fibromyalgia has shown up in the medical assessment for claimant in the 2010 treatment records, there have been no trigger points reported for claimant on physical examination. As noted, claimant's medical treatment with respect to her alleged orthopedic complaints has been very sporadic and overall, the medical findings, on physical examination and diagnostic testing, do not establish a disabling orthopedic impairment(s) that would warrant total disability for claimant.

Accordingly and based on the above, the undersigned finds claimant's subjective allegations of disability not credible and not supported by the totality of the medical evidence. The undersigned, overall, finds that claimant's allegations of severe bilateral hand pain and dysfunction to be not supported by the medical evidence. As noted previously, claimant's left hand surgery in 2008 appears to have been successful and claimant has had no further treatment with respect to her left hand or right hand for that matter. Additionally, reported activities of daily living for claimant, as noted by claimant and her daughter and as previously discussed, are not consistent with allegations of severe bilateral hand problems. Accordingly, the undersigned finds that claimant has no significant limitations with respect to her hands that would prevent her from performing gainful employment.

(Tr. at 12-17).

## 1. PRIOR WORK RECORD

The ALJ appropriately noted that plaintiff has a stable work history. He also noted that plaintiff left her last job when the business closed, not due to any impairment. Plaintiff testified that she would have continued doing the job if her employer had not shut down. Additionally, plaintiff's daughter indicated that plaintiff spends part of her day looking for jobs on the internet, which supports a finding that plaintiff's continued unemployment is not due to an inability to perform a job but rather an inability to find a job. Loss of a job due to a decline in work which coincides with a claimant's alleged onset date does not support a finding of disability. Medhaug v. Astrue, 578 F.3d 805, 816-817 (8th Cir. 2009). Looking

for work is inconsistent with a claim of disability. Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

## 2. DAILY ACTIVITIES

The ALJ noted that plaintiff's daily activities are inconsistent with complete disability. Plaintiff is able to hold onto a lawn mower and cut her grass, she can use a weed eater although that causes thumb pain, she can prepare meals, wash dishes, do laundry, shop, iron for an hour and a half (which requires holding an iron and maneuvering it with the hand), and vacuum. She can drive, which requires one to hold onto and turn a steering wheel; she can talk on the phone; and she can play Sudoku, which requires either use of a computer mouse or a pen/pencil, both of which are done with the hand.

## 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff was assessed with fibromyalgia one time since her alleged onset date; however, there were no treatment recommendations and no further testing was recommended. Plaintiff has had no treatment on her hands since her alleged onset date. Plaintiff has had no treatment on her neck. Plaintiff testified that she suffers back pain two to three times a week; however, the medical records do not reflect that she ever complained of back pain to her doctor.

Despite a rheumatologist "strongly recommending" that plaintiff participate in a regular exercise program, she does not. She claims her doctor only recommended water aerobics and she cannot afford that; however, there are many forms of exercise which are free and there is nothing in any medical record indicating that plaintiff was limited in what types of regular exercise would benefit her. Plaintiff's failure to pursue this recommended treatment despite her doctor's strong recommendation suggests her symptoms are not as bad as she alleges and is inconsistent with a disabling impairment. Bradley v. Astrue, 528 F.3d

1113, 1115 (8th Cir. 2008) (failure to follow a recommended course of treatment weighs against a claimant's credibility); Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir.2005) (same).

Plaintiff was asked at the hearing what was her biggest impediment to working. She included her blood pressure, but did not mention her hips. The medical records show that plaintiff's blood pressure has been asymptomatic.

**4.      PRECIPITATING AND AGGRAVATING FACTORS**

The record establishes that lying down aggravates plaintiff's pain, which is inconsistent with her testimony. She told Dr. Warner that lying down aggravates her pain as does walking. The ALJ determined that plaintiff was limited to sedentary work which greatly limits her need to walk on the job. Plaintiff testified that she lies down anywhere from a half an hour to two hours a day to give her back a rest. However, there are no abnormal findings with respect to her back, there are no complaints of back pain to any doctor, and the only discussion about lying down in the medical records shows that plaintiff reported it aggravated her pain rather than alleviated it.

**5.      DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION**

Plaintiff told Dr. Warner that she had tried Tramadol but that it had not helped. However, the record shows that plaintiff was prescribed nothing but Tramadol through the last medical record in the file. Plaintiff reported stomach upset from Ibuprofen for the first time on October 26, 2010, and before then that is all she took for her allegedly disabling symptoms including her arthritis. Lack of strong pain medication is inconsistent with complaints of disabling pain. Richmond v. Shalala, 23 F.3d 1441, 1443-44 (8th Cir. 1994).

Case 4:11-cv-01144-REL   Document 16   Filed 03/23/13   Page 30 of 34

6.    *FUNCTIONAL RESTRICTIONS*

The only functional restrictions in the record are from after plaintiff's thumb surgery which pre-dates her alleged onset date.  She was released to return to work with no restrictions prior to her alleged onset date.   Plaintiff's treating doctors did not recommend physical restrictions; conversely, her doctor has strongly encouraged a regular exercise program.  This is completely inconsistent with plaintiff's allegations and inconsistent with disability.

Further, plaintiff's symptoms predate her alleged onset date by many years and she continued to work despite those symptoms.  She worked as an appointment clerk when her pain was at its worst before surgery, and she continued to work during the healing process following surgery.

I also note that plaintiff met face to face with a disability determinations counselor who observed that plaintiff had no difficulty using her hands or writing.  This is consistent with plaintiff's own report in a Missouri Supplemental Questionnaire wherein she said she uses a computer for two hours at a time.

Plaintiff's medical records do not support disabling limitations.  Her right thumb x-rays showed only early degenerative arthrosis and no arthritis.  Her left hip x-ray showed only mild arthritis; her right shoulder x-rays showed only mild arthritis.  In fact, the findings were so mild that Dr. Warner characterized the x-rays of plaintiff's shoulders and hips to be normal.  X-rays of plaintiff's neck showed only degenerative disc disease.  In September 2009, plaintiff reported much more pain in her right hip than her left, but she did not complain of right hip pain before or after this appointment with Dr. Warner.  According to her testimony and in her other medical records, it was her left hip which caused her pain; yet on the September 2009 visit with Dr. Warner, the doctor found that plaintiff had full and pain-free

31

range of motion in her left hip. In November 2009, Dr. Singh assessed degenerative joint disease (without specifying any particular body part) and called it "stable." The exam of plaintiff's musculoskeletal system was normal. In September 2010, Dr. Singh noted that plaintiff's exam was entirely normal except for tenderness in a finger. In October 2010, plaintiff's exam was normal including joints, bones, and muscles. Her one diagnosis of fibromyalgia was made on plaintiff's complaints of all-over body pain despite normal exam findings, and no treatment was recommended.

In plaintiff's disability report, she was asked why her conditions affect her ability to work. She reported only that repetitive motion hurts her right shoulder. She did not indicate that she had limitations using her hands.

Plaintiff testified that sitting is hard on her hips and aggravates her back pain, and that it is hard for her to get up from a sitting position. Yet she told her physical therapist that she had no pain with sitting. She testified that she could only stand for 15 minutes, but in her Function Report she indicated that her condition does not affect her ability to stand.

B.   CREDIBILITY CONCLUSION

Based on all of the Polaski factors as discussed both by the ALJ and above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disabling impairments are not credible.

VII.   PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff argues that the ALJ erred in assessing her residual functional capacity, mostly because he discredited her subjective complaints. That argument, as discussed above, is meritless.

Based on the credible evidence of record, the ALJ formulated a detailed residual functional capacity that specifically accounted for plaintiff's pain. He found that plaintiff

32

could only work in a clean environment, free of excessive dust, smoke and other harmful irritants because of asthma, despite the record showing her asthma is stable and relatively unsymptomatic.

The ALJ found that plaintiff could lift up to ten pounds. Plaintiff's daily activities support this finding as do the medical records. Immediately following her hand surgery, Dr. Langford advised plaintiff to limit lifting with the left hand to five pounds but she was released for full-duty work a few months later and no other lifting restrictions appear in the record. In fact, plaintiff was working as an appointment clerk both at the time of her surgery and after the procedure, indicating that plaintiff retained the residual functional capacity to perform that job even when her symptoms were at their worst.

To account for plaintiff's complaints of arthritis in her hips, the ALJ limited her to work that involves sitting six hours and standing/walking for only two hours maximum in an eight-hour workday. This limitation is consistent with plaintiff's admission at the administrative hearing that her job as an appointment clerk allowed her to get up and walk around for 15 minutes if she needed to do so. Additionally, the ALJ found that plaintiff could only occasionally bend and never crawl, kneel, crouch, or squat. To account for any limitations due to arthritis in plaintiff's shoulder, the ALJ found that she could not perform repetitive overhead lifting or reaching. Plaintiff testified that her job as an appointment clerk did not require overhead lifting or reaching.

Finally, the ALJ found that plaintiff could frequently use her hands which, for all the reasons discussed above, is fully supported by the record.

Although not required, the ALJ properly questioned a vocational expert whose testimony assisted him in determining that plaintiff could perform her past relevant work. See Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007) ("we may use the services of vocational

experts or vocational specialist . . . to obtain evidence we need to help us determine whether you can do your past relevant work"), citing 20 C.F.R. § 404.1560(b)(2). Based on a hypothetical question which included all of plaintiff's credible limitations and remaining abilities, the expert testified that plaintiff could still perform her work as an appointment clerk. Plaintiff argues that she should have been found disabled under the medical-vocational guidelines, but this argument is simply not relevant. Because the ALJ properly determined that plaintiff could perform her past relevant work, reference to the medical-vocational guidelines was not appropriate or necessary. Lybrand v. Astrue, 2012 WL 762092, n.5 (D.S.C., February 8, 2012).

## VIII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
March 22, 2013

34